------------------------------------------------------------- X
                                         :

CHRISTOPHER PRINCE,               :
                                         :

                    Petitioner,     :
                                         :            MEMORANDUM
          - against -              :            <u>AND ORDER</u>
                                         :

ROBERT ERCOLE, Superintendent,    :          08-CV-5197 (JG)
                                         :

                       Respondent.  :
------------------------------------------------------------- X

A P P E A R A N C E S :

        CHRISTOPHER PRINCE
                04-R-1765
                Green Haven Correctional Facility
                P.O. Box 4000
                Stormville, NY 12582-0010
                Petitioner, *pro se*

        RICHARD A. BROWN
                District Attorney
                Queens County
                125-01 Queens Boulevard
                Kew Gardens, NY 11415-1568
        By:    Rebecca Lynne Height
                John M. Castellano
                Attorneys for Respondent

JOHN GLEESON, United States District Judge:

                Christopher Prince, a prisoner incarcerated in the Green Haven Correctional

Facility pursuant to a judgment of the New York State Supreme Court, Queens County, petitions

for a writ of habeas corpus under 28 U.S.C. § 2254. Prince challenges his conviction following a

jury trial of attempted murder in the second degree, assault in the first degree (two counts),

criminal possession of a weapon in the second and third degrees, and reckless endangerment in

the first degree. Appearing *pro se*, Prince seeks habeas relief on the grounds discussed below.

Oral argument was held on April 24, 2009, at which Prince appeared by videoconference from the facility in which he is serving his sentence. For the reasons set forth below, the petition is denied.

BACKGROUND

A.      *The Offense Conduct*

The state's evidence at trial established that on March 11, 2001, at approximately 3:20 a.m., on the campus of St. John's University, Prince fired a nine millimeter gun about five times at a group of about 15 students, from a distance of only a few feet away. One bullet hit Corey Mitchell in the back, permanently paralyzing him. Another bullet hit Rashan Fray, permanently damaging his knee. A third bullet grazed Tyson Holley-Hines's leg. Prince was arrested, indicted in New York Supreme Court, Queens County, and charged with three counts of attempted murder in the second degree; five counts of assault in the first degree; five counts of assault in the second degree; criminal possession of a weapon in the second degree; criminal possession of a weapon in the third degree; and reckless endangerment in the first degree.

B.      *The Procedural History*

1.      *The Trial Court Proceedings*

a.      *The First Two Trials*

The first trial against Prince ended in a mistrial on July 21, 2002. A subsequent investigation revealed that one of Prince's witnesses in the first trial, Stanley Heriveaux, lied during the trial. Heriveaux had testified that he did not know Prince when in fact he had been friends with him and was present for the crime: Heriveaux had driven Prince to the scene, stood next to him when he fired the first shot and then drove him home after the shooting. Prince and Heriveaux had agreed that if Heriveaux were contacted about the shooting, he would say that he

did not know Prince.  Prince was indicted and charged with perjury in the first degree, criminal solicitation in the fourth degree and obstructing governmental administration in the second degree.

Prince proceeded to a second trial before Judge Joel Blumenfeld and a jury on both indictments.  On October 27, 2003, another mistrial was granted when the jury could not reach a verdict.

### b.      The Third Trial

In the fall of 2004, Prince proceeded to trial on both indictments again, this time before a jury and Judge Richard L. Buchter.

### i.      The People's Case

On Saturday, March 10, 2001, a party was hosted by the St. John's University track team at Traditions, a bar in Queens County.  Durron Newman and Corey Mitchell, members of the St. John's University football team, were bouncers at the party.  Also in attendance were Esther Antoine -- Newman's girlfriend, Omar Lewis, Tyson Holley-Hines and Rashan Fray.  Eric Mateo was also present that night with his friends Mike and Carl Pyronneau, Ferdinand Jeans, Ahmed Abukehazy, and the petitioner, Christopher Prince.  Mateo had a contentious history with Newman and Michael Holley-Hines (Tyson's brother) because of a prior incident regarding a woman.

Mateo and Newman had several tense confrontations inside the bar.  After one incident in which Mateo and Newman bumped shoulders and exchanged hostile stares while walking opposite directions on the stairs, Mateo's friends, who were upstairs, discussed starting a fight.  They were holding pool sticks and beer bottles, and standing in a circle.  Someone in the

group said, "Fuck those St. John's niggers." Tr. 571.[1]  Antoine then went to find Mitchell to tell

him that her boyfriend, Newman, was surrounded by Mateo and his friends.  In response,

Mitchell and several other football players went upstairs to help Newman.  Mateo and some of

the football players stared at each other before Mateo and his group of friends left Traditions.

After leaving the bar, Mateo and his friends met up at 14th Street between Union Turnpike and

Traditions, where they decided to go to the St. John's campus.

At approximately 3:00 a.m., on the morning of Sunday, March 11, 2001, Mitchell,

Esther Antoine, Newman, Lewis, Holley-Hines, Fray and several of their friends left Traditions

and returned to the campus in a caravan to make sure that everyone got home safely.  They were

concerned there might be an altercation with Mateo and his friends.  Once they arrived at the

campus, a group of football players and their friends stood outside of the dormitories chatting.

About 15 minutes later, Prince, Mateo, Carl Pyronneau, Jeans, Chris Duplessy, Heriveaux, Kevin

Eusey and Abukehazy arrived at the St. John's campus.  Mateo had driven there with Duplessy,

Eusey and Abukehazy; Heriveaux with Prince, Brian Antoine and his cousin Guerson.

Mateo wanted to fight the football players.  He was specifically trying to start a

fight with Newman, to whom he directed his comments.  Tr. 1073.  Mitchell told Newman to get

the fight over with if he was going to do it because it was cold, late and Mitchell had to go to

church in the morning.

When Prince arrived, he walked over to a lit lamppost and leaned against it.  The

area was well-lit because the dorms were new and the lights were recently installed.  Prince

started to wave his hands around and walk back and forth, screaming, "all you guys are capes"

(meaning punks), and "You niggers is playing me close."  Tr. 1074, 1630.  Prince told Holley-

Hines, "You can get into it big man."  Holley-Hines responded, "You don't want it."  Tr. 533.

---

[1]    Throughout this opinion "Tr." refers to the trial transcript.

Fray told Prince that he should relax and "calm down" and "chill out." Tr. 65. When Prince yelled, "You all going to jump my man in school," Mitchell responded that he was six feet two inches tall and 285 pounds and was not going to jump anyone. Tr. 1631-32. Prince said that he did not believe him and Mitchell reiterated that he would not jump anyone. Meanwhile, Newman and Mateo, who had been arguing, began to resolve their dispute. Newman decided he was going to let the argument end without a fight. Mateo asked Newman to put this behind them and to agree to cease fighting.

Prince lifted his shirt and from a distance of about five feet, Newman could see the butt of a gun at Prince's waist. Newman told Lewis that Prince had a gun and that they should stop arguing and leave. Newman tried to tell Mitchell, but Mitchell was involved in a heated argument with Prince.

Prince pulled Mateo back and said, "E, no more words." Tr. 1076. Next, Prince reached into his pants, retrieved the gun and fired it at the crowd. Most of the people turned to run away, some towards their cars and others toward the dorms. Tyson Holley-Hines, who had been standing about five-to-six feet in front of Prince when he shot the gun, froze and stared at him. Mitchell, who had been standing in front of Prince, turned to run away but was shot in the back. He fell to the ground and could not get up. Holley-Hines asked Mitchell if he could move his legs, and Mitchell replied that he could not. Another bullet hit Fray in the knee. A third grazed Holley-Hines's leg.

Mateo and his friends left the campus in their cars after the shooting. Mateo's car stopped next to Heriveaux's at a red light. Prince was in the back seat of Heriveaux's car holding his head and rocking back and forth. The met up at 210th Place in Queens County, where Prince told them that he thought he "caught a body." Tr. 1084. Prince stated that he had

children and instructed the others not to reveal to the police that he had fired the gun. Mateo agreed.

On Monday, March 12, 2001, the police went to Mateo's home. Mateo accompanied them back to the precinct where he told them that Prince had been the shooter and made a written statement. Mateo then went with the police to Prince's home and identified him as the person who had fired his gun at St. John's campus the previous night. Prince was arrested. Later that evening, the police conducted a line-up. Newman, Fray, Esther Antoine, Lewis, and Holley-Hines each viewed the line-up and identified Prince as the shooter.

After Prince had been arrested, he called Heriveaux. Heriveaux told him that he did not want to get involved and agreed that if he was contacted about the shooting, he would say that he did not know Prince. Subsequently, Heriveaux told a detective for the District Attorney's office, an investigator for Prince, and Prince's attorney that he did not know Prince and did not know the identity of the shooter.

A medical expert testified that Mitchell was paralyzed from the waist down as a direct result of a bullet penetrating his spinal cord and would never walk again. Mitchell suffered other complications from the shooting as well and had surgery to remove the bullet fragment from his spine.

<em>ii.    The Defense Case</em>

According to Prince's mother, sister and girlfriend, on the evening of the shooting, they were home and had dinner with Prince, his father and Prince's fourteen-month old son. Prince's girlfriend, who was nine months pregnant at the time, claimed that at 9:00 p.m., Prince gave his son a bath. Prince's sister stated that she went out around 10:00 p.m. Prince's mother testified that she was with her son and grandson from 9:00 p.m. until 11:30 p.m. At

approximately 11:30 p.m., Prince's mother claimed that she saw Prince in his room and heard him talking to his girlfriend until about 12:30 a.m., when she fell asleep. Prince's girlfriend testified that she was in Prince's bedroom with him until she fell asleep around 1:00 a.m. At approximately 2:00 or 2:30 a.m., Prince's girlfriend woke up and asked Prince to warm a bottle for their son. She fell back asleep about 5:00 a.m. When Prince's sister came home at about 2:30 a.m., Prince asked her why she came home after her curfew.

According to Michael Pyronneau, Carl Pyronneau and Andrew Stephenson, on the night of the incident they were drinking beer and smoking marijuana in the vicinity of 207th Street, Queens Village with Mateo, Jeans, Brian Antoine, Heriveaux, David Stanford and Fabian Puena. At about 11:15 p.m., the group went to Traditions. According to Stephenson, at one point he wore Mateo's jacket and could feel a gun inside one of the pockets. When they left Traditions at approximately 2:30 a.m., they noticed that Pyronneaux's car window had been broken. They believed some of the football players were responsible.

Carl Pyronneaux claimed that after he left Traditions, he saw Mateo drive past him and decided to follow him. Carl Pyronneaux and Lawrence Glover, who was in another car with Brian Antoine and Andrew Stephenson, claimed that when they arrived at St. John's campus, they saw Mateo arguing with a group of people in front of the dormitories. Carl Pyronneaux admitted that he did not see a gun or who fired the shots. Glover claimed that he saw Mateo pull out the gun, but did not see the gun fired. Carl Pyronneaux and Glover drove to 210th Place because that was the place the group normally went before or after "an event." Tr. 1872-73; 2080-81. Mateo arrived a few minutes later.

Carl Pyronneaux admitted that after he learned that Prince had been arrested, he did not speak with Prince, but instead made eight phone calls to Mateo that day. Carl

Pyronneaux denied that he had called Mateo a rat and a snitch to others or to Mateo over e-mail. Carl Pyronneaux, Michael Pyronneaux and Glover testified that they did not see Prince on the evening of the shooting. They also testified that they did not know whether Prince had been present at Traditions or on the St. John's campus.

Prince's mother, sister, girlfriend, Carl Pyronneaux, Stephenson and Glover each admitted that when they learned Prince had been arrested for the shooting they did not go to the police or the D.A.'s office with their information. Prince's mother and girlfriend also admitted that they did not tell this information to Prince's attorney until about four months after he had been hired.

Prince's mother admitted that she did not know where her son had been between 12:30 a.m. and 10:00 a.m. on March 11. Prince's mother admitted that she attended every day of her son's first and second trials and watched all of the witnesses testify. Stephenson also admitted that he observed parts of the first and second trials in this case.

iii.    *Rebuttal*

In the People's rebuttal case, John Donovan, a public safety officer at St. John's University, testified. On the night of the shooting he had been working at Gate One, the only gate open at night as access to and from the campus. His responsibility was to record the time and identifying information for each car entering the campus. After he heard shots the in the early morning hours of March 11, 2001, Donovan received a radio transmission instructing him to record all vehicles leaving the campus. He did not record a car with license plate number "CL3-59C," which belonged to Glover, as having entered or exited campus that night.

iv.    *Conviction and Sentencing*

On October 8, 2004, the jury found Prince guilty of attempted murder in the second degree, assault in the first degree (two counts), criminal possession of a weapon in the second and third degrees and reckless endangerment in the first degree. Prince was acquitted of two counts of attempted second degree murder, two counts of first degree perjury and one count of fourth degree criminal solicitation.

On November 15, 2004, Prince was sentenced to concurrent determinate terms of imprisonment of 25 years for attempted murder, 25 years for the first degree assault of Corey Mitchell, 15 years for second degree weapons possession, seven years for third degree weapons possession, and an indeterminate term of imprisonment of from two and one-third to seven years for first degree reckless endangerment. The sentences were imposed consecutively to a term of imprisonment of 5 years for the first degree assault of Rashan Fray. All of these sentences were imposed consecutively to Prince's four year sentence for an unrelated conviction.[2]

2. *The Direct Appeal*

On November 17, 2004, Prince filed a notice of appeal to the Appellate Division, Second Department. In that appeal, Prince argued that (1) the prosecutor engaged in misconduct during her summation by denigrating the defense, presenting arguments that were unsupported by the evidence and vouching for witnesses, and (2) the court's instructions improperly informed the jurors that they could trust that the eyewitnesses were reliable.

On January 23, 2007, the Appellate Division issued a decision, rejecting each of petitioner's claims and affirming his conviction. *People v. Prince*, 831 N.Y.S.2d 182 (2d Dep't

---

[2]     While out on bail on this case, on March 20, 2003, at about 1:50 a.m., in Queens County, Prince fired a loaded firearm at Orville Mongol and then fired another round into the air. For this conduct, Prince was arrested and charged with attempted murder in the second degree; criminal possession of a weapon in the second degree; criminal possession of a weapon in the third degree; reckless endangerment in the first degree; menacing in the second degree; and harassment in the second degree. Prince was tried and convicted by a jury on March 30, 2004, of criminal possession of a weapon in the third degree. On April 20, 2004, he was sentenced as a violent felony offender to a term of imprisonment of four years. On October 7, 2008, the Appellate Division, Second Department, affirmed his judgment of conviction. *People v. Prince*, 864 N.Y.S.2d 331 (2d Dep't 2008).

2007).  The Appellate Division held that Prince had preserved his claim that the prosecutor vouched for the credibility of her witnesses and reviewed any unpreserved challenges to the prosecutor's statements pursuant to its interest of justice jurisdiction.  The court ruled that many of the prosecutor's comments constituted fair comment on the evidence and fair response to defense counsel's summation, and any prejudice arising from the prosecutor's statements regarding identification was alleviated when the court sustained defense counsel's objections and provided curative instructions to the jury.  Finally, the court stated that "to the extent that any alleged inappropriate comment remained unaddressed, any error was harmless in light of the overwhelming evidence of [Prince's] guilt." *Id.*  As for Prince's challenge to the court's charge, the Appellate Division ruled that it was both unpreserved for review and without merit.  *Id.*

Prince sought permission for leave to appeal to the Court of Appeals enclosing the appellate briefs and the Appellate Division's decision.  On February 26, 2007, Prince mailed a follow-up letter requesting that the Court of Appeals review whether the prosecutor improperly vouched for witnesses or commented on matters outside of the evidence.  Prince's application was denied on April 16, 2007.  *People v. Prince*, 8 N.Y.3d 949 (2007).

### 3.    *Motion for a Writ of Error Coram Nobis*

On June 2, 2008, Prince moved in the Appellate Division, Second Department, for a writ of error *coram nobis*, claiming that he was denied effective assistance of appellate counsel.  Petitioner claimed that appellate counsel was ineffective because she (1) raised issues that were unpreserved for appellate review; (2) failed to argue that the cumulative effect of the prosecutor's statements on summation prejudiced his right to a fair trial; and (3) omitted the argument that trial counsel was ineffective for (i) failing to object to the trial court's instruction on identification and failing to object to "all" of the prosecutor's challenged comments on

10

summation, (ii) failing to limit the prosecutor's cross-examination of his alibi witnesses, (iii) failing to object to the court's charge that eyewitness Heriveaux was an accomplice as a matter of law with respect to the perjury charges, and (iv) failing to request a recantation charge regarding Heriveaux's testimony. In his reply brief to the state's opposition papers, Prince added an additional ground for ineffective assistance of appellate counsel: failure to allege ineffective assistance of trial counsel based on (i) failure to preclude the prosecutor's cross-examination of his alibi witnesses regarding their communications, or lack thereof, with law enforcement, (ii) failure to object when the court allegedly failed to instruct the jury that the prosecution was required to disprove Prince's alibi defense beyond a reasonable doubt, and (iii) failure to object to the court's alleged failure to instruct the jury to employ the same standard in its evaluation of Prince's alibi witnesses as the prosecution's identification witnesses.

On September 23, 2008, the Appellate Division denied Prince's motion, holding that he had "failed to establish that he was denied the effective assistance of appellate counsel." *People v. Prince*, 863 N.Y.S.2d 609 (2d Dep't 2008). Prince sought permission for leave to appeal to the Court of Appeals, which was denied on November 21, 2008. *People v. Prince*, 900 N.E.2d 563 (N.Y. 2008).

4.      *The Instant Petition*

Prince filed the instant petition on December 15, 2008, claiming that he is entitled to a writ of habeas corpus under 28 U.S.C. § 2254 on three grounds: (1) prosecutorial misconduct based on improper summation statements; (2) an improper jury instruction on identification; and (3) ineffective assistance of appellate counsel for the same reasons specified in his motion for a writ of error *coram nobis*.

As discussed below, Prince's petition is denied.

DISCUSSION

*A.    The Standard of Review*

      *1.    Exhaustion and Procedural Default*

      28 U.S.C. § 2254(b) prevents a federal court from granting a petition for a writ of habeas corpus unless the petitioner has first exhausted all available state judicial remedies.  In order to have exhausted those remedies, a petitioner must have "fairly presented" his federal constitutional claims to the highest state court by apprising it of "both the factual and the legal premises of the claim he asserts in federal court."  *Daye v. Attorney Gen.*, 696 F.2d 186, 191 (2d Cir. 1982) (*en banc*).  An unexhausted claim that can no longer be exhausted is deemed procedurally defaulted.  *See Aparicio v. Artuz*, 269 F.3d 78, 90 (2d Cir. 2001) ("[W]hen 'the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred,' federal habeas courts also must deem the claims procedurally defaulted." (quoting *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991))).

      A claim that has been procedurally defaulted in state court generally cannot be reviewed on the merits by a federal habeas court.  *See Harris v. Reed*, 489 U.S. 255, 260-62 (1989) (explaining rationale for habeas corpus procedural default rule); *see also Coleman*, 501 U.S. at 750 (noting a state's interest in "channeling the resolution of claims to the most appropriate forum, in finality, and in having an opportunity to correct its own errors").  However, there are two circumstances in which a federal claim that has been procedurally defaulted -- or deemed procedurally defaulted due to the exhaustion requirement -- will nonetheless be reviewable on a federal petition for habeas corpus.

12

First, a petitioner is entitled to review of a procedurally defaulted claim if he can show "cause for the default and actual prejudice as a result of the alleged violation of federal law." *Coleman*, 501 U.S. at 750; *Teague v. Lane*, 489 U.S. 288, 298 (1989). A petitioner may establish cause by showing "that the factual or legal basis for a claim was not reasonably available to counsel, . . . or that some interference by officials . . . made compliance impracticable." *Coleman*, 501 U.S. at 753 (internal quotation marks omitted). To show prejudice, a petitioner must demonstrate that the alleged error worked to his "actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Torres v. Senkowski*, 316 F.3d 147, 152 (2d Cir. 2003) (internal quotation marks omitted).

Second, if the petitioner is unable to show cause and prejudice, his procedural default may nonetheless be excused if he or she can show that a fundamental miscarriage of justice would result from a failure to hear the claim on the merits, *i.e.*, "that he is actually innocent of the crime for which he has been convicted." *Dunham v. Travis*, 313 F.3d 724, 730 (2d Cir. 2002) (citing *Schlup v. Delo*, 513 U.S. 298, 321 (1995)). This ground for excusing procedural default should be applied only in "extraordinary" cases, as courts deem substantial claims of actual innocence "extremely rare." *Schlup*, 513 U.S. at 321-22.[3]

2.    *Review of State Court Adjudications on the Merits Under AEDPA*

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") narrowed the scope of federal habeas review of state convictions where the state court has adjudicated a petitioner's federal claim on the merits. 28 U.S.C. § 2254(d). Under the AEDPA standard, the

---

[3]    A procedural bar actually relied on by a state court to dispose of a claim may be found inadequate to prevent federal review on rare occasions where the state court applies the procedural bar in an "exorbitant" manner. *Lee v. Kemna*, 534 U.S. 362, 376 (2002); *see also Cotto v. Herbert*, 331 F.3d 217, 239 (2d Cir. 2003). This doctrine has no apparent application in a case in which an unexhausted claim is deemed procedurally defaulted, as that is a case in which by definition no state court has applied a procedural bar in any manner, exorbitant or otherwise.

reviewing court may grant habeas relief only if the state court's decision "was contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States" or "was based on an unreasonable determination of the

facts in light of the evidence presented in the State court proceeding." *Id.*[4]

      The Supreme Court has interpreted the phrase "clearly established Federal law" to

mean "the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of

the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *see also*

*Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001).  A decision is "contrary to" clearly

established federal law if "the state court arrives at a conclusion opposite to that reached by [the

Supreme Court] on a question of law or if the state court decides a case differently than [the

Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13.

A decision is an "unreasonable application" of clearly established federal law if a state court

"identifies the correct governing legal principle from [the Supreme Court's] decisions but

unreasonably applies that principle to the facts of [a] prisoner's case." *Id.* at 413.  "In other

words, a federal court may grant relief when a state court has misapplied a 'governing legal

principle' to 'a set of facts different from those of the case in which the principle was

announced.'" *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Lockyer v. Andrade*, 538

U.S. 63, 76 (2003)).

      Under the "unreasonable application" standard set forth in *Williams*, "'a federal

habeas court may not issue the writ simply because that court concludes in its independent

judgment that the relevant state-court decision applied clearly established federal law

erroneously or incorrectly.  Rather, that application must also be unreasonable.'" *Gilchrist*, 260

---

[4] This limited scope of review is often referred to as "AEDPA deference."  *E.g., Jimenez v. Walker*,
458 F.3d 130, 135 & n.2 (2d Cir. 2006).

F.3d at 93 (quoting *Williams*, 529 U.S. at 411). Interpreting *Williams,* the Second Circuit has added that although "'[s]ome increment of incorrectness beyond error is required … the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence.'" *Id.* at 93 (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)).

AEDPA's limited scope of review applies whenever a state court disposes of a state prisoner's federal claim on the merits and reduces its disposition to judgment, regardless of whether it refers to federal law in its decision. *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001).

## B. *Prince's Claims*

### 1. *Procedural Misconduct*

Prince argues that he was denied a fair trial based on prosecutorial misconduct. Citing to "Point One" of his direct appeal brief as the basis for the first ground of his habeas petition, Prince argues that the prosecutor acted improperly by vouching for witnesses, making arguments unsupported by the evidence, and denigrating the defense. Although Prince raised the prosecutorial misconduct claim on direct appeal, respondent argues that the claim is unexhausted (and should be deemed procedurally defaulted) because Prince failed to "fairly present" it as a *federal* constitutional due process claim to the state courts. I disagree.

"The exhaustion requirement is not satisfied unless the federal claim has been 'fairly presented' to the state courts." *Daye*, 696 F.2d at 191. A petitioner has fairly presented his federal claim to the state courts when he has "informed the state court of both the factual and the legal premises of the claim he asserts in federal court." *Id.* "Specifically, [the petitioner] must have set forth in state court all of the essential factual allegations asserted in his federal

petition…. [and] must have placed before the state court essentially the same legal doctrine he asserts in his federal petition." *Id*. at 191-92.

While respondent is correct that Prince did not explicitly cite federal constitutional law "chapter and verse" in support of his arguments, a habeas petitioner may nonetheless fairly present a federal claim in state court in other ways, including by (a) relying on pertinent federal cases employing constitutional analysis, (b) relying on state cases employing constitutional analysis in like fact situations, (c) asserting the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) alleging a pattern of facts that is well within the mainstream of constitutional litigation. *Daye*, 696 F.2d at 194; *accord*, *e.g*., *Strogov v. Attorney General*, 191 F.3d 188, 191 (2d Cir. 1999). In these circumstances the Second Circuit has instructed federal habeas courts to assume that the state courts have been alerted to consider, and have considered, the constitutional claim. *Daye*, 696 F.2d at 194.

The facts alleged by Prince are "well within the mainstream of constitutional litigation," *Daye*, 696 F.2d at 194, as petitioners routinely raise similar claims of prosecutorial misconduct as grounds for habeas relief. *See e.g.*, *Garofolo v. Coomb*, 804 F.2d 201, 206 (2d Cir. 1986) (prosecutorial misconduct claim in habeas petition within mainstream of constitutional litigation). Accordingly, I conclude that Prince "fairly presented" his prosecutorial misconduct claim to the state courts and thus that it is properly before me for habeas review.

On direct appeal, the Appellate Division addressed Prince's preserved claim that the prosecutor vouched for the credibility of the People's witnesses as well as unpreserved challenges to the prosecutor's comments, which the court reviewed pursuant to its interest of justice jurisdiction. In rejecting Prince's claim, the court stated that many of the prosecutor's summation comments were proper because they were a fair response to the defense counsel's

summation and a fair comment on the evidence and that "[a]ny prejudice that may have resulted from the prosecutor's vouching for the credibility of the People's witnesses based on the statement that the witnesses could not have been mistaken in their identification of the defendant was alleviated when the trial court sustained the defendant's objections and provided curative instructions." *Prince*, 831 N.Y.S.2d at 183. Finally, the Second Department explained, "To the extent that any alleged inappropriate comment remained unaddressed, any error was harmless in light of the overwhelming evidence of the defendant's guilt." *Id*. The Appellate Division thus disposed of Prince's improper summation claim on the merits, and I must therefore review the issue under the deferential AEDPA standard. *See Sellan*, 261 F.3d at 309.

Habeas relief based on a claim of prosecutorial misconduct during opening statement or summation is unavailable unless the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *see also Floyd v. Meachum*, 907 F.2d 347, 353 (2d Cir. 1990) ("[T]he Supreme Court has instructed federal courts reviewing habeas claims brought by state prisoners and premised upon prosecutorial misconduct in summation to distinguish between ordinary trial error of a prosecutor and that sort of egregious misconduct ... amount [ing] to a denial of constitutional due process.") (internal quotation marks omitted). A petitioner "must demonstrate that he suffered actual prejudice because the prosecutor's comments during summation had a substantial and injurious effect or influence in determining the jury's verdict." *Bentley v. Scully*, 41 F.3d 818, 824 (2d Cir. 1994); *Floyd*, 907 F.2d at 355 (the comments must be "'so prejudicial that they rendered the trial in question fundamentally unfair.'" (quoting *Garofolo*, 804 F.2d at 206)). In making this determination, the habeas court should consider the severity of the prosecutor's conduct; the

measures, if any, that the trial court took to remedy any prejudice; and the certainty of conviction absent the prosecutor's remarks. *United States v. Elias*, 285 F.3d 183, 190 (2d Cir. 2002); *United States v. Perez*, 144 F.3d 204, 210 (2d Cir. 1998); *Bentley*, 41 F.3d at 824.

The statements Prince complains of, none of which rise to the level of constitutional error, fall into three general categories. The first are statements to which objections were sustained, thus rendering harmless any error resulting from the comments.[5] The Appellate Division correctly noted that any prejudice that may have resulted from the prosecutor's vouching for witnesses' credibility was alleviated when the trial court sustained the defense's objections and provided curative instructions to the jury. The second category of statements includes those which were fair comment on the evidence or fair argument.[6] A

---

[5] The trial court sustained objections to the following statements: (1) "[Prince] still wants you to believe that he is not the shooter ... despite the fact that Eric Mateo's identification of the defendant could never be mistaken cause [sic] he knows him " (Tr. 2493); (2) "And you observed [the People's witnesses], intelligent, independent, reliable witnesses who testified with great care--" (Tr. 2499); (3) "These are circumstances that would not lead to any kind of mistake … let alone six of the same mistakes. These are circumstances that would easily lead, and that did lead, to accurate identification." (Tr. 2515-17) (Here, the court also instructed the prosecutor not to vouch for witnesses and provided a curative instruction to the jury: "[T]he comments of either attorney are to be predicated upon the evidence and not any personal opinions of either attorney." *Id.*); and (4) "And Tyson and Rashan and Durron and Corey and Omar analyzed the situation as it went on, and they watched him, because he was a small person making big threats against people who were much larger than him. And they began to analyze that and figure that he must have some kind of weapon if he's making these threats to try and back it up." (Tr. 2510).

[6] The following comments are deemed to be fair comment on the evidence or fair argument: (1) "And [the People's witnesses] didn't waver because they saw [Prince], they observed him, they remember him, they recognized him and they identified him." (Tr. 2501-02); (2) "The circumstances, the light, the distance, the time, their heightened observation because of the danger that the defendant presented[,] these circumstances are not circumstances that would lead to a mistake … let alone six of the same mistakes. These are circumstances that would lead to a[n] accurate identification." (Tr. 2517); (3) "And you can see that [Prince] matched that description given by the eyewitnesses in every respect. Even though the description was accurate, even though it matched him in every respect, what is important, too, is being able to recognize someone, not about necessarily painting a picture in words, although these witnesses could do that and they did do it and do it accurately, it's about being able to recognize someone, and they did, in addition to accurately describing, and I submit to you he's pretty distinctive looking … Distinctive looking in his face, distinctive looking in his hairstyle[,] distinctive looking so that he would be easily recognizable. They recognized him." (Tr. 2518-19); (4) "[Eric Mateo] put in [his statement to the police] that he saw Chris fire the shots and then run away; which is exactly what happened." (Tr. 2534); (5) "I submit to you, too, when you think about how they acted on the stand, you look at their demeanor, shows their reaction to stress; it could be a very stressful thing, like we talked about in jury selection, to sit somewhere and answer questions in front of a crowd of people." (Tr. 2499); (6) "This was a time when their powers of observation[] were heightened because of the situation, because of what had happened earlier that night and because [of] what they were thinking might happen on the campus of St. John's." (Tr. 2506-07); (7) "You have more, ladies and gentlemen, even with these six eyewitnesses observing the defendant under the optimal conditions that would lead to an accurate identification ..." (Tr. 2529); (8) "Eric Mateo is the only one who the people at St. John's knew. Eric

prosecutor has broad latitude during summation, particularly when responding to defense counsel's summation. Only a handful of the challenged comments fall into a third category -- comments that were improper but that did not amount to the kind of error that meets the stringent standard necessary for habeas relief.[7] *See Fry v. Pliler*, 551 U.S. 112, ---, 127 S. Ct. 2321, 2328 (2007) ("[I]n § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht*" (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 622 (1993))).

In sum, it was not an unreasonable application of *Darden* for the state court to find that the challenged comments did not infect the trial with unfairness. Moreover, given the abundant evidence of guilt, even if some statements were inappropriate, they would not warrant the grant of habeas relief because they did not have a substantial and injurious effect or influence on the jury's verdicts. *See Fry*, 127 S. Ct. at 2328.

### 2. *Improper Jury Instruction*

Prince claims that the trial court improperly instructed the jury regarding how to evaluate the reliability of identification testimony. He asserts that the court's instruction removed from the purview of the jury the question of whether the eyewitnesses were reliable.[8]

---

Mateo would be the reasonable one that the police would probably come looking for, and the defendant knew that, and that's why he went to him and that's why he told him you need to keep quiet for me, I think I caught a body." (Tr. 2533); (9) "And who better than Stanley Heriveaux to [lie] for [defendant];... someone who was young and unsophisticated -- someone who was a high school senior who looked up to him. … Someone who would be easy to convince." (Tr. 2544); (10) "When the defendant fired those shots on the campus of St. John's University there is no doubt what he intended to do, he intended to kill and it didn't matter who." (Tr. 2560); and (11) "[Andrew Stephenson, a defense witness] gives you an absolutely incredible story … He wants you to believe this conveniently tailored testimony, this testimony he just tells you because he wants to help out his very good friend, Christopher Prince. It's a very creative story; it's a lie." (Tr. 2554).

[7]     For example, it was inappropriate for the prosecutor to state that "[the lineup] was conducted in accordance with strict police procedure," when the officer testified that although he received "on the job training" he was not familiar with the police manual with respect to lineups and that he did not recall any procedure for a lineup. (Tr. 1023-24, 1044, 2520-21).

[8]     The challenged portion of charge reads as follows:
        [I]t is your function to evaluate each of the witnesses' opportunity to observe ... and to evaluate also the mental capacity of each of the witnesses to reason and remember what he did in fact

Prince's challenge to the trial court's jury instructions is procedurally defaulted because the Appellate Division rejected this claim as both unpreserved for appellate review and without merit. *People v. Prince*, 831 N.Y.S.2d at 183. Generally, a claim is barred from habeas review when a state court relies on a state procedural rule to reject a claim. *Coleman*, 501 U.S. at 729. In finding Prince's challenge to the trial court's jury charge unpreserved for appellate review, the Appellate Division expressly invoked a state procedural ground: The failure to make a contemporaneous objection. *See People v. Prince*, 831 N.Y.S.2d at 183 (citing N.Y. Crim. Proc. Law § 470.05(2)). Prince has no plausible argument with respect to the adequacy of the state ground barring federal review of his claims. *See, e.g.*, *People v. Contes*, 60 N.Y.2d 620, 621 (1983) (challenges to jury instruction were unpreserved for appellate review when they were not objected to at trial); *People v. Taylor*, 782 N.Y.S.2d 921 (2d Dep't 2004) (same).

The New York Court of Appeals' subsequent decision summarily rejecting Prince's application for leave to appeal the Appellate Division's decision does not alter the determination that Prince's claim is procedurally barred from federal habeas review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991) (holding that where "the last reasoned opinion on the claim explicitly imposes a procedural default, we will presume that a later decision rejecting the claim did not silently disregard that bar and consider the merits"). Because the state court's decision actually and explicitly relied on a procedural default, there is an independent and adequate state law ground for the judgment, to which I must defer even where the state court also reaches the merits. *See Harris*, 489 U.S. at 264 n. 10 ("[A] state court need not fear reaching the

---

observe. … In performing such functions, you may ... compare the details of the description given to the police with the physical features and characteristics of the defendant here on trial. If the description matches, *you may consider that the witness did in fact have an opportunity to observe and the mental capacity for reason and memory*. If the description does not match, or to the extent that it does not match, you may decide that the witness had neither the opportunity or the mental capacity to reason at the time and to remember the physical features and other characteristics of the perpetrator.
Tr. 2602-03 (emphasis added by Prince).

merits of a federal claim in an alternative holding.") (emphasis omitted); *Glenn v. Bartlett*, 98

F.3d 721, 724 (2d Cir. 1996) ("'[F]ederal habeas review is foreclosed when a state court has

expressly relied on a procedural default as an independent and adequate state ground, even where

the state court has also ruled in the alternative on the merits of the federal claim.'" (quoting

*Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir. 1990))).

Prince's claim is procedurally barred because he has failed to show cause for the

default,[9] prejudice therefrom or that a miscarriage of justice would result if the improper jury

instruction claim were not reviewed here.

In any event, the claim is meritless. The adequacy of a state court's jury charge is

a matter of state law and is not ordinarily grounds for habeas relief. *See United States ex rel.*

*Smith v. Montanye*, 505 F.2d 1355, 1359 (2d Cir. 1974). For a jury charge to give rise to such

relief, a petitioner must carry a heavy burden. "The burden of demonstrating that an erroneous

instruction was so prejudicial that it will support a collateral attack on the constitutional validity

of a state court's judgment is even greater than the showing required to establish plain error on

direct appeal." *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977). The petitioner must show "not

merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it

violated some right which was guaranteed to the defendant by the Fourteenth Amendment."

*Cupp v. Naughten*, 414 U.S. 141, 146 (1973). The question "is not whether the trial court failed

to isolate and cure a particular ailing instruction, but rather whether the ailing instruction by itself

so infected the entire trial process that the resulting conviction violates due process." *Id.* at 147.

In making this determination, a court "must consider the challenged portion of the charge not 'in

_____

[9]    Prince does not attempt to show cause for his default, and there are no conceivable bases for such
cause on the facts of his case. For example, any argument by Prince that his counsel's failure to object amounted to
"cause," would have failed because "the mere fact that counsel failed to recognize the factual or legal basis for a
claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default." *Murray
v. Carrier*, 477 U.S. 478, 486 (1986).

artificial isolation,' but rather 'in the context of the overall charge.'" *Justice v. Hoke*, 45 F.3d 33, 34 (2d Cir. 1995) (quoting *Cupp*, 414 U.S. at 146-47).

Prince has not overcome this high threshold. Viewing the charge in its entirety, I perceive no error at all in the instruction on identification testimony, let alone error that would warrant habeas relief. The court instructed the jurors that in assessing the reliability of identification testimony, it was appropriate for them to consider, if they wished, whether the witnesses' descriptions of the shooter to the police matched the description of the defendant. I find nothing objectionable in that instruction. At the very least, the Appellate Division's rejection of Prince's challenge to it cannot be characterized as an unreasonable application of federal law, and thus, habeas relief is not available to Prince on this ground.

### 3. *Ineffective Assistance of Appellate Counsel*

Finally, repeating the claims made in his unsuccessful motion for a writ of error *coram nobis*, Prince claims that his appellate counsel was defective in numerous ways. "The proper standard for evaluating [a] claim that appellate counsel was ineffective ... is that enunciated in *Strickland v. Washington*." *Smith v. Robbins*, 528 U.S. 259, 285 (2000). Applying this standard, I conclude that the Appellate Division reasonably determined, when it considered Prince's motion for a writ of error *coram nobis*, that Prince was not denied the effective assistance of appellate counsel. *See People v. Prince*, 863 N.Y.S.2d 609 (2d Dep't 2008).

The Supreme Court has established the following standard for claims of ineffective assistance in *Strickland v. Washington*:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so

> serious as to deprive the defendant of a fair trial, a trial whose
> result is reliable.  Unless a defendant makes both showings, it
> cannot be said that the conviction … resulted from a breakdown in
> the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Thus, to make out this type of claim, the

petitioner must demonstrate both (1) that his attorney's performance "fell below an objective

standard of reasonableness," *id*. at 688, and (2) that "there is a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at

694.

In assessing whether counsel's performance was deficient, judicial scrutiny "must

be highly deferential," and the court must "indulge a strong presumption that counsel's conduct

falls within the wide range of reasonable professional assistance; that is, the defendant must

overcome the presumption that, under the circumstances, the challenged action might be

considered sound trial strategy."  *Id.* at 689 (internal quotation marks omitted); *accord Jackson v.

Leonardo*, 162 F.3d 81, 85 (2d Cir. 1998); *see also Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003)

(*per curiam*) ("[C]ounsel has wide latitude in deciding how best to represent a client. . . .").  The

Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct,"

*Wiggins*, 539 U.S. at 521, instead emphasizing that "'[t]he proper measure of attorney

performance remains simply reasonableness under prevailing professional norms,'" *id.* (quoting

*Strickland*, 466 U.S. at 688), which requires "a context-dependent consideration of the

challenged conduct as seen 'from counsel's perspective at the time.'"  *Wiggins*, 539 U.S. at 523

(quoting *Strickland*, 466 U.S. at 689).

To establish the required "reasonable probability" that counsel's errors changed

the outcome of the case, the petitioner must show not just "some conceivable effect," *Strickland*,

466 U.S. at 693-94, but rather "a probability sufficient to undermine confidence in the outcome,"

*id*. at 694. This determination, unlike the determination whether counsel's performance was deficient, may be made with the benefit of hindsight. *Lockhart v. Fretwell*, 506 U.S. 364, 371-73 (1993).

As indicated above, the same test applies to claims regarding the performance of appellate counsel. *See Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994); *Claudio v. Scully*, 982 F.2d 798, 803 (2d Cir. 1992). Appellate counsel need not present every nonfrivolous argument that could be made. *See Mayo*, 13 F.3d at 533 (citing *Jones v. Barnes,* 463 U.S. 745, 754 (1983)); *see also Evitts v. Lucey*, 469 U.S. 387, 394 (1985) (emphasizing that appellate counsel "need not advance *every* argument, regardless of merit, urged by the appellant" (emphasis in original)). Moreover, reviewing courts should not employ hindsight to second-guess an appellate attorney's strategy choices any more than it may do so in evaluating the performance of trial counsel. *See Mayo*, 13 F.3d at 533 (citing *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993)). A petitioner, however, may establish constitutionally inadequate performance if he shows that his appellate counsel omitted material and obvious issues while pursuing matters that were patently and significantly weaker. *Cf. Jackson v. Leonardo*, 162 F.3d 81, 85 (2d Cir. 1998) ("[R]elief may be warranted when a decision by counsel cannot be justified as a result of some kind of plausible trial strategy.").

a. *Appellate Counsel's Argument of Issues Unpreserved for Appellate Review*

Prince asserts that appellate counsel was ineffective because counsel raised unpreserved claims on appeal. However, appellate counsel may "raise an unpreserved issue in the hope of convincing the appellate court to review the unpreserved issue in the exercise of its interest of justice jurisdiction." *Sutherland v. Senkowski*, Nos. 02-CV-3833 & 03-MISC-0066, 2003 WL 22953066, at *12 (E.D.N.Y. Oct. 17, 2003) (citing N.Y. Crim. Proc. Law §

470.15(6)(a)). As discussed above, Prince's appellate counsel sought review of certain unpreserved challenges to the prosecutor's comments as well as the unpreserved claim that the jury instruction on identification testimony was improper. The Appellate Division chose to exercise its interest of justice jurisdiction with respect to the former but declined to do so with the latter. This hardly signifies that appellate counsel was ineffective for choosing to raise the jury instruction claim; indeed, appellate counsel's conduct falls within the wide range of "reasonable professional assistance." *Strickland*, 466 U.S. at 689.[10]

Accordingly, Prince's claim that his appellate counsel was ineffective for raising the unpreserved claims on direct appeal is without merit.

b.    *Appellate Counsel's Failure to Argue that the Cumulative Effect of the Prosecutor's Summation Remarks Prejudiced His Right to a Fair Trial*

Prince's claim that appellate counsel erred by failing to argue that the cumulative prejudice from the prosecutor's comments prejudiced his right to a fair trial is meritless. Although appellate counsel did not explicitly seek review of the challenged comments "for their cumulative effect," she implicitly invited such review by drawing the Appellate Division's attention to dozens of comments and arguing that Prince was denied a fair trial based on a range of statements made in summation (as demonstrated by the nearly 20 pages of the appeal brief devoted to this claim). The Appellate Division examined the prosecutor's summation as a whole and determined that the comments were either proper, objected to and cured by the trial court, or "harmless in light of the overwhelming evidence of [Prince's] guilt." *People v. Prince*, 831 N.Y.S.2d at 183. Thus, this claim cannot be a basis for habeas relief.

---

[10]    In his papers, Prince expresses concern that the merits of the improper jury instruction claim would not be addressed in federal court. He argues that the challenge to the jury instruction should have been brought as a ground for ineffective assistance of trial counsel, where counsel was ineffective for failing to timely object to the instruction. However, because I conclude that the jury instruction was not constitutionally troublesome, I would not have found that trial counsel was ineffective for failing to object to it, had the claim been presented in that posture.

c.      *Appellate Counsel's Failure to Assert a Claim of Ineffective Assistance of Trial Counsel*

Prince's final argument is that his appellate counsel should have brought a claim of ineffective assistance of trial counsel.  Because Prince's allegations as to his trial counsel's ineffectiveness are meritless, as he has failed to demonstrate any prejudice from any alleged error, his claim for ineffective assistance of appellate counsel based on this ground must also fail.

First, Prince argues that his trial counsel failed to object to (a) the trial court's instruction on identification and (b) "all" of the prosecutor's comments on summation.  It follows from the preceding discussion that I would not find any ineffective assistance based on trial counsel's failure to object to the trial court's jury instruction.  Since I would not find that the jury instruction was improper, I would conclude that trial counsel could not properly be criticized for failing to object to it.  *See also Aparicio*, 269 F.3d at 99 ("[C]ounsel's failure to object to a jury instruction (or to request an additional instruction) constitutes unreasonably deficient performance only when the trial court's instruction contained clear and previously identified errors.") (internal quotation marks omitted).  Nor would I find that Prince's trial counsel performed ineffectively by failing to object to all of the prosecutor's comments on summation.  Whether and when to make an objection during summation is precisely the sort of strategic trial decision that warrants deference.

Second, Prince would fault his trial counsel for failing to attempt to limit the prosecutor's cross-examination of his alibi witnesses.  Specifically, Prince argues that trial counsel should have objected to the prosecutor's cross-examination of the alibi witnesses regarding their delay in coming forward and their relationships to Prince.  He also contends that trial counsel should have objected to the prosecutor's comments in summation about the alibi testimony.  However, a prosecutor may inquire on cross-examination about an alibi witness's

relationship to the defendant and knowledge of the case. Here, when the prosecutor did so, the record shows that trial counsel made various objections. In addition, the trial court instructed the jury -- both in curative instructions and as part of the charge -- that a witness has no legal obligation to report information to the police. Accordingly, trial counsel's representation in this regard was not deficient and would not be a ground for ineffectiveness.

Third, Prince asserts his trial counsel was ineffective in failing to object to the court's charge on accomplice testimony as it related to the perjury charges. The court instructed the jury that because Stanley Heriveaux was an accomplice as a matter of law, in order to find Prince guilty of perjury, the jury would need to find corroboration for Heriveaux's testimony.[11] Prince argues that the charge "usurp[ed] the power and function of the jury" and prejudiced him by creating a "spill-over effect" by causing the jury to form an accomplice association between himself and Heriveaux. Prince's *Coram Nobis* Br. at 18. Even assuming the charge was improper, which it was not, there was no spill-over in this case. "Spill-over" occurs when erroneous instructions cause a jury to improperly convict a defendant on the instructed counts and prejudicially influence its verdict on the "non-tainted" counts to which the instruction did not apply. *See People v. Doshi*, 93 N.Y.2d 499, 505 (1999). Because Prince was acquitted of the perjury charges for which the accomplice testimony charge was given, there could not have been any spill-over effect on the remaining counts. Moreover, as noted above, the decision not to challenge the instruction was a legitimate strategic decision deserving deference because the instruction did not contain "clear and previously identified errors." *Aparicio*, 269 F.3d at 99.

---

[11]     The trial court's accomplice witness instruction was proper. Heriveaux was an accomplice as a matter of law because he was convicted of the charges arising out of the same transaction resulting in defendant's charge and testified against Prince regarding those same charges. *See People v. Sweet*, 577 N.E.2d 1030, 1033 (N.Y. 1991). N.Y. Crim. Proc. Law § 60.22 provides that a defendant may not be convicted of any offense upon the testimony of an accomplice unsupported by corroborative evidence.

Thus, Prince's claim that he was prejudiced because his trial counsel did not object to the charge is without merit.

Fourth, Prince argues that his trial counsel's failure to request a recantation charge regarding Heriveaux's testimony amounted to ineffective assistance. Prince's contends that Heriveaux's testimony was unreliable because it was later recanted. As an initial matter, and as stated previously, defense counsel's failure to request an additional instruction when the court's instruction is legally correct does not amount to deficient performance. *See id.* Moreover, the record shows that the court specifically instructed the jury to "carefully scrutinize" Heriveaux's testimony in light of the fact that he may have received a benefit in exchange for his testimony and also instructed the jury that certain witnesses may have given previous testimony inconsistent with their trial testimony, and that such statements could be considered a factor in determining their credibility. Tr. 2585-86. As such, jurors were properly instructed to make their own credibility determinations with respect to Heriveaux. This claim of ineffectiveness would also fail because Prince cannot demonstrate that he suffered any prejudice.

For similar reasons, Prince's argument that his trial counsel should have requested a jury instruction that the prosecution was required to disprove his alibi defense beyond a reasonable doubt also fails. The trial court charged the jury that "The People are required to prove beyond a reasonable doubt, on all the evidence presented, that the defendant was the person who committed the crimes and therefore was not elsewhere at the time of their commission." Tr. 2587. The charge also instructed that the defense had no burden to prove the alibi, and that even if the alibi were false the jury could not find Prince guilty for that reason alone because it would improperly shift the burden from the prosecution to the defense. Tr. 2586-87. There being no error in any of these charges, and there being no doubt that the jury

was properly instructed as to the burden of proof, trial counsel could not reasonably be deemed ineffective for failing to request something more.[12]

Because these claims of ineffective assistance of trial counsel are meritless, appellate counsel was not ineffective for failing to raise them. *See, e.g.*, *Rolling v. Fischer*, 433 F. Supp. 2d 336, 351 (S.D.N.Y. 2006) ("[T]here can be no claim of ineffective assistance of appellate counsel where the underlying claims of ineffective assistance of trial counsel are themselves meritless.").

For the foregoing reasons, Prince's ineffective assistance claim fails.

CONCLUSION

For the foregoing reasons, the petition is denied. As Prince has failed to make a substantial showing that he was denied a constitutional right, no certificate of appealability shall issue.

So ordered.

John Gleeson, U.S.D.J.

Dated:    Brooklyn, New York
          May 1, 2009

---

[12]    Prince's argument that his trial counsel erred in failing to address the trial court's failure to instruct the jury to evaluate the alibi witnesses by the same standard as it should the prosecution witnesses is also meritless. The trial court instructed the jury to "use the same yardstick in measuring the credibility and value of all testimony" and never implied that the alibi witnesses should be evaluated according to a different standard. Tr. 2581. Therefore trial counsel had no basis to lodge an objection.